IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TERRAINE LIGHTNING | ) | CASE NO. |
| 1412 East Boston Avenue | ) | |
| Youngstown, Ohio, 44502 | ) | JUDGE: |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | **COMPLAINT FOR DAMAGES** |
| | ) | |
| WALMART, INC. | ) | **(Jury Demand Endorsed Hereon)** |
| c/o CT Corporation System | ) | |
| 4400 Easton Commons Way, Ste 125 | ) | |
| Columbus, Ohio, 43219 | ) | |
| | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| BRIAN CREIGHTON | ) | |
| c/o Walmart # 3860 | ) | |
| 200 Goldie Road | ) | |
| Liberty, Ohio, 44505 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| JEFFERY MILLER | ) | |
| c/o Walmart # 3860 | ) | |
| 200 Goldie Road | ) | |
| Liberty, Ohio, 44505 | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Terraine Lightning, by and through undersigned counsel, as her Complaint against

Defendants, states and avers the following:

**NATURE OF THE CLAIMS**.

1.     This is an action for declaratory, injunctive and equitable relief, as well as for monetary

damages, to redress Defendants' unlawful discriminatory and retaliatory termination of

Lightning's employment, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"),

Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), Ohio Revised Code § 4112.02(A), and the Family Medical Leave Act, 29 U.S.C § 2601 ("FMLA").

## PARTIES.

2. Lightning is a resident of the city of Youngstown, county of Mahoning, state of Ohio.

3. Walmart, Inc. ("Walmart") is a foreign corporation that operates "Walmart" stores throughout Ohio, to include the Walmart store # 3860 located at 200 Goldie Road, Liberty, Ohio, 44505 ("Walmart 3860").

4. Creighton is an individual believed to be residing in Mahoning and/or Trumbull County, Ohio.

5. Miller is an individual believed to be residing in Mahoning and/or Trumbull County, Ohio.

## JURISDICTION AND VENUE.

6. Walmart hires citizens of the state of Ohio; contracts with companies in Ohio; and owns or rent properties in Ohio. As such, the exercise of personal jurisdiction over Walmart comports with due process.

7. This Court is vested with subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as this action involves federal questions regarding the deprivation of Lightning's rights under Title VII and Section 1981.

8. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Lightning's state law claims under Ohio Revised Code § 4112.02, *et seq* because those claims derive from the same common nucleus of operative facts as Lightning's federal law claims.

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE HISTORY.

10. Within 300 days of the conduct alleged below, Lightning filed a Charge of Discrimination with the Equal Opportunity Employment Commission ("EEOC"), Charge No. 532-2021-02354, against Defendants.

11. On or about August 11, 2021, the EEOC issued and mailed a Notice of Right to Sue letter to Lightning.

12. Lightning received her Right to Sue letter from the EEOC in accordance with 42 U.S.C. § 2000e-5(f)(1), which has been attached hereto as Exhibit 1.

13. Lightning filed this Complaint within 90 days of the issuance of her Notice of Right to Sue letter.

14. Lightning has properly exhausted her administrative remedies pursuant to 29 C.F.R. § 1614.407(b) and O.R.C § 4112.052(B)(2).

## FACTUAL ALLEGATIONS.

15. Lightning is African American.

16. Lightning is a former employee of Walmart.

17. At all times referenced herein, Lighting worked at Walmart 3860.

18. Lightning was first hired by Walmart in or around November of 2017 as an Associate.

19. In or around 2018, Lighting was promoted to the position of Department Manager for the Walmart 3860's automotive department.

20. In or around June or July of 2019, Creighton became Lightning's direct supervisor.

21. Creighton is Caucasian.

22. Creighton supervised the entire automotive department at Walmart 3860.

23. At all times referenced herein, Walmart maintained a policy against race discrimination ("Discrimination Policy").

24. On several occasion, Creighton referred to African American employees as "nigger(s)".

25. One several occasions, Creighton called an African American Service Writer named Allen (last name unknown) a "nigger."

26. On at least one occasion, a service writer named Sarah Mazon overheard Creighton ask "where did that nigger Terraine go" while Lightning was on a break.

27. Creighton's calling African American employees "nigger" violated Walmart's Discrimination Policy.

28. Alternatively, Walmart allows supervisors to call their African American subordinates "nigger."

29. Creighton regularly referred to one of Walmart 3860's Hispanic Automotive Technicians, Carlos, as a "dirty spic."

30. Creighton's calling a Hispanic employee "dirty spic" violated Walmart's Discrimination Policy.

31. Alternatively, Walmart allows supervisors to call their Hispanic subordinates "dirty spic."

32. Creighton regularly made jokes about the Indian ancestry of another service writer, Kelli Lamphert.

33. Creighton's making jokes about Lamphert's Indian ancestry violated Walmart's Discrimination Policy.

34. Alternatively, Walmart allows supervisors to mock the ancestry of their subordinates.

35. Creighton treated Lightning and other non-Caucasian employees differently than the Caucasian employees he supervised.

36. For example, Creighton required Lightning to perform menial tasks normally performed by Associates, rather than Department Managers, such as unloading trucks.

37. Associates and other non-managerial employees usually unloaded trucks.

38. Creighton did not require any Caucasian managers to perform Associate-level task like unloading trucks.

39. Creighton required Lightning to unload trucks because she is African American.

40. At all times referenced herein, Lighting had minor children.

41. Lighting would have to make childcare arrangements when she was scheduled to work.

42. Lightning was responsible for ensuring that her minor children went to school.

43. Prior to Creighton becoming Lightning's manager, Walmart provided Lightning with flexibility in her work hours so that Lightning could probably ensure that her minor children were taken care of and/or got to school.

44. Lightning's former manager allowed Lighting the flexibility to report to work a few minutes late, provided that she made up the time later, such as at the end of her shift or on another day during the same workweek.

45. Lightning was regularly late to work prior to Creighton becoming her manager but was not disciplined or assessed points for it.

46. Lighting regularly worked past her scheduled shift to make up her late start time and was not disciplined or assessed points for it.

47. Lighting regularly reported to work early to make up prior late starts and was not disciplined or assessed points for it

48. The flexibility extended to Lightning was a common practice at Walmart 3860.

49. After Creighton became Lightning's manager, he began to assess attendance points to Lightning for reporting to work late, reporting to work early, and for working late.

50. Creighton targeted Lighting for assessing attendance points because Lighting is African American.

51. Creighton continued to provide flexibility around scheduled hours of work for non-African American employees, even as he targeted Lighting.

52. For example, Creighton continued to offer flexibility to Mazon, who is Caucasian, when she had difficulty getting to work on time due to her attending college.

53. Treating subordinate employees differently because of their race violates Walmart's discrimination policy.

54. Alternatively, it is acceptable for supervisors at Walmart to treat employees differently based on their race.

55. In or around August of 2019, the father of Lightning's children suddenly and unexpectedly passed away.

56. In or around late October 2019, Lightning's daughter, Nyrah, was seriously injured in an automobile accident ("Accident").

57. Nyrah was away at college in West Virginia when she was involved in the Accident.

58. Nyrah had to return home to live with Lightning while she recovered from the Accident.

59. Nyrah required Lighting's assistance with bathing, cooking, and other daily activities while she was recovering from the Accident.

60. Between the passing of her children's father and Nyrah's accident, Lighting began to experience depression and anxiety.

61. Shortly after Nyrah's Accident, Lighting informed Creighton that she needed to take time off because of her need to help Nyrah and because she was feeling overwhelmed and depressed ("Time Off Request").

62. Lightning's Time Off Request put Walmart on notice that she required leave for an FMLA qualifying reason.

63.  Creighton responded to Lightning's Time Off Request by warning her "you can't take off black Friday."

64.  "Black Friday" is the day after Thanksgiving, regarded as the first day of the traditional Christmas shopping season, on which retailers like Walmart offer special reduced prices.

65.  Creighton responded to Lighting's Time Off Request by telling her that there were only two weeks left until the "holiday season" and that if Lighting took more time off than that, she would be terminated.

66.  By telling Lighting that she could only take two weeks off, Creighton interfered with Lightning's rights under the FMLA.

67.  Walmart failed to provide Lighting with notice of her rights under the FMLA in response to her Time Off Request within five days of her request to Creighton, in violation of the FMLA. See 29 CFR § 825.300.

68.  Subsequently, Lighting submitted the paperwork necessary to take FMLA leave for two weeks, from approximately November 4, 2019 through November 19, 2019.

69.  Had Creighton not misinformed Lightning about her rights under the FMLA, Lighting would have opted to either take a full twelve weeks of FMLA leave and/or to take intermittent FMLA leave.

70.  Lightning needed to take more than two weeks off from work because of the needs of her daughter and due to her own mental health needs; however, she limited her time off based on Creighton's warning that she would be terminated if she was off on black Friday or during the "holiday season."

71.  During Lighting's absence, Lamphert overheard Creighton complaining about Lighting to another employee named Sam (last name unknown) and calling her a "lazy nigger" because she had taken FMLA leave ("Lazy Nigger Remark").

7

72. Sam is Caucasian.

73. Sam was a subordinate to Lightning.

74. Creighton referred to Lightning as "lazy" because she had taken FMLA leave.

75. Creighton's Lazy Nigger Remark violated Walmart's Discrimination Policy.

76. Alternatively, Walmart permits is managers to refer to their subordinates as "lazy nigger(s)."

77. Lightning returned to work during the week of November 18, 2019.

78. Upon returning to work, Lamphert told Lightning about the Lazy Nigger Remark.

79. Lightning was outraged and hurt by the Lazy Nigger Remark.

80. Subsequently, Lightning reported Creighton's Lazy Nigger Remark to Walmart 3860's Store Manager, Jeffrey Miller ("First Race Discrimination Complaint.")

81. Lightning told Miller about the disparate treatment she believed Creighton was subjecting her to because of her race as part of her First Race Discrimination Complaint.

82. Walmart has a policy to investigate reports of unlawful discrimination.

83. Pursuant to Walmart policy, an investigation of discrimination or harassment should include interviewing the complainant.

84. Pursuant to Walmart policy, an investigation of discrimination or harassment should include interviewing the subject of the complaint.

85. Pursuant to Walmart policy, an investigation of discrimination or harassment should include interviewing the subject of the reported discrimination.

86. Pursuant to Walmart policy, an investigation of discrimination or harassment should include interviewing witnesses to the reported discrimination.

87. Pursuant to Walmart policy, an investigation of discrimination or harassment should include getting a written statement from the complainant.

88. Pursuant to Walmart policy, an investigation of discrimination or harassment should include getting a written statement from the subject of the complaint.

89. Pursuant to Walmart policy, an investigation of discrimination or harassment should include getting a written statement from the subject of the reported discrimination.

90. In response to Lightning's First Race Discrimination Complaint, Walmart did not interview Lightning.

91. In response to Lightning's First Race Discrimination Complaint, Walmart did not interview Creighton.

92. In response to Lightning's First Race Discrimination Complaint, Walmart did not interview Sam.

93. In response to Lightning's First Race Discrimination Complaint, Walmart did not interview Lamphert.

94. In response to Lightning's First Race Discrimination Complaint, Walmart did not interview Mazon.

95. In response to Lightning's First Race Discrimination Complaint, Walmart did not interview any witnesses at all.

96. In response to Lightning's First Race Discrimination Complaint, Walmart did not get a written statement from Lightning.

97. In response to Lightning's First Race Discrimination Complaint, Walmart did not get a written statement from Creighton.

98. In response to Lightning's First Race Discrimination Complaint, Walmart did not get a written statement from Sam.

99. In response to Lightning's First Race Discrimination Complaint, Walmart did not get a written statement from Lambhert.

100. In response to Lightning's First Race Discrimination Complaint, Walmart did not get a written statement from Mazon.

101. In response to Lightning's First Race Discrimination Complaint, Walmart did not get a written statement from anyone.

102. Walmart did not investigate Lightning's First Race Discrimination Complaint at the time it was made.

103. Upon information and belief, Walmart has a progressive disciplinary policy.

104. Walmart did not give Creighton a verbal warning as a result of Lightning's First Race Discrimination Complaint.

105. Walmart did not give Creighton a written warning as a result of Lightning's First Race Discrimination Complaint.

106. Walmart did not give Creighton a final written warning as a result of Lightning's First Race Discrimination Complaint.

107. Walmart did not suspend Creighton as a result of Lightning's First Race Discrimination Complaint.

108. Walmart did not terminate Creighton as a result of Lightning's First Race Discrimination Complaint.

109. Walmart did not put any record of Lightning's First Race Discrimination Complaint in Creighton's file.

110. Walmart did not discipline Creighton at all in connection with Lightning's First Race Discrimination Complaint.

111. By not disciplining Creighton at all based on Lightning's First Race Discrimination Complaint, Walmart condoned and ratified his conduct.

112. Miller responded to Lightning's First Race Discrimination Complaint by offering to transfer her to an Associate position within a different department at Walmart 3860.

113. A transfer to an Associate position would have been a demotion for Lightning.

114. Rather than address Creighton's multiple violations of Walmart's Discrimination Policy, Miller retaliated against Lightning for making her First Race Discrimination Complaint by giving her a choice between demotion and continuing to be subjected to racially motivated harassment and discrimination.

115. Desperate to get away from a manager who regarded her and other African Americans as "nigger(s)," Lightning accepted Miller's offer to demote her to an Associate position.

116. Miller told Lightning that she would be transferred after the upcoming pay period closed.

117. Subsequent to making her First Race Discrimination Complaint, Lightning encountered Creighton.

118. Lightning was still upset about Creighton's racist remarks about her when she encountered Creighton.

119. As Creighton began to speak to Lightning, she interjected that "I know you called me out of my name while I was gone…don't you ever call me a nigger again" (Second Race Discrimination Complaint").

120. Creighton denied calling Lightning a "nigger" and demanded to know who told her that he did.

121. Lightning refused to disclose to Creighton who told her about his calling her a "nigger."

122. Nyrah continued to require Lightning's assistance subsequent to Lightning's FMLA leave.

123. Lighting missed work on November 26, 2019 due to needing to help Nyrah.

124. Lightning notified Walmart that she would be calling off on November 26, 2019, as required by Walmart policy.

125. Lightning's November 26, 2021 absence would have been a covered absence under the FMLA had Lighting been able to perfect her FMLA leave properly, and without the interference of Creighton.

126. Lightning missed work on December 5 and 6, 2019, due to her need to care for Nyrah.

127. Lightning's December 5 and 6, 2019 absences would have been a covered absence under the FMLA had Lighting been able to perfect her FMLA leave properly, and without the interference of Creighton.

128. Lightning notified Walmart that she would be calling off on December 5 and 6, 2019, as required by Walmart policy.

129. On December 7, 2019, Lightning received a call from Sam, who notified her that she was being terminated.

130. When Lightning questioned Sam on how he had authority to terminate her, Sam told her that Creighton had asked him to call Lighting and notify her of her termination.

131. Lightning was angered and emotionally devastated by her termination.

132. Lighting was further outraged by the fact that Creighton had used Sam, the Caucasian Associate who laughed at Creighton's Lazy Nigger Remark, to carry out her termination.

133. Sam did not provide Lightning with a reason for her termination.

134. Lightning was terminated because of her race, African American.

135. Lighting was terminated in retaliation for her First Race Discrimination Complaint, which was made only one to two weeks prior to her termination.

136. Lightning was terminated in retaliation for requesting leave for an FMLA qualifying reason, which Creighton felt made Lightning "lazy."

137. Upon information and belief, Creighton participated in the decision to terminate Lightning.

138. Upon information and belief, Miller participated in the decision to terminate Lightning.

139. Subsequent to Lightning's termination, her legal counsel sent Walmart a notice of claims ("NOC").

140. In response to Lightning's NOC charge, Walmart asserted that Lightning had been terminated due to her attendance ("Response Letter").

141. In the Response Letter, Walmart admitted that Lightning had not been written up in the 24 months for minor attendance infractions prior to Creighton becoming her manager.

142. In the Response Letter, Walmart admitted that Lightning was only first assessed points for her attendance when Creighton became her manager.

143. In the Response Letter, Walmart admitted that it had counted Lightning's absences on November 26, 2019, December 5, 2019, and December 6, 2019 against her in deciding to terminate her employment, when those absence would have been covered by FMLA had Defendants not interfered with Lightning's FMLA rights.

144. Upon information and belief, Walmart failed to investigate the allegations levied by Lightning against Creighton in connection with her NOC letter.

145. Had Walmart investigated Lightning's allegations in her NOC letter, it would have obtained corroborating statements from Lamphert and Mazon, as well as others.

146. Upon information and belief, Walmart continues to employ Creighton.

147. As a result of Defendants' unlawful conduct, Lightning has suffered and continues to suffer damages.

### **COUNT I: RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981.**

148. Lightning re-alleges and incorporates by reference the allegations set forth in paragraphs 1-147, above.

149. Defendants' discrimination against Lightning violated the rights afforded to Lightning under the Civil Rights Act of 1866, 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991.

150. By the conduct described above, Defendants intentionally deprived Lightning of the same rights as are enjoyed by Caucasian citizens to the creation, performance, enjoyment, and all benefits and privileges, of her employment relationship with Walmart, in violation of Section 1981.

151. As a result of Defendants' discrimination against Lightning in violation of Section 1981, Lightning has been denied employment opportunities providing substantial compensation and benefits, thereby entitling Lightning to injunctive, equitable, and compensatory monetary relief.

152. As a result of Defendants' discrimination against Lightning in violation of Section 1981, Lightning has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

153. In its discriminatory actions as alleged above, Defendants acted with malice or reckless indifference to the rights of Lightning, thereby entitling Lightning to an award of punitive damages.

154. To remedy the violations of the rights of Lightning secured by Section 1981, Lightning requests that the Court award her the relief prayed for below.

### COUNT II:  UNLAWFUL RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 2000e-2(a), et seq. (Asserted Against Walmart Only).

155. Lightning re-alleges and incorporates by reference the allegations set forth in paragraphs 1-147, above.

156. Walmart subjected Lightning to different employment rules, practices, and standards because of her race in violation of 42 U.S.C. § 2000e-2(a).

157. Walmart terminated Lightning from her employment without just cause because of her race in violation of 42 U.S.C. § 2000e-2(a).

158. Walmart's discrimination against Lightning violated of the rights secured to her by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e et seq., as amended by the Civil Rights Act of 1991.

159. By the conduct described above, Walmart intentionally violated Lightning's rights under Title VII.

160. As a result of the violation of Lightning's Title VII rights, Lightning is entitled to equitable and injunctive relief, including "rightful place" and "make whole" remedies and equitable monetary relief, to remedy and compensate for the effects of Walmart' unlawful actions.

161. As a result of the Walmart intentional violation of Lightning's Title VII rights, Lightning has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

162. In its discriminatory actions as alleged above, Walmart has acted with malice or reckless indifference to Lightning's rights, thereby entitling Lightning to an award of punitive damages.

163. To remedy the violation of Lightning's rights secured by Title VII, Lightning request that the Court award her the relief prayed for below.

### COUNT III: UNLAWFUL RACE DISCRIMINATION IN VIOLATION OF O.R.C. § 4112.02.
### (Asserted Against Walmart Only).

164. Lightning re-alleges and incorporates by reference the allegations set forth in paragraphs 1-147, above.

165. Walmart subjected Lightning to different employment rules, practices, and standards because of her race in violation of O.R.C. § 4112.02 (A).

166. Walmart terminated Lightning from her employment without just cause because of her race in violation of O.R.C. § 4112.02 (A).

167. Walmart's discrimination against Lightning violated of the rights secured to her by O.R.C. § 4112.02 (A).

168. As a result of Walmart's discrimination against Lightning in violation of O.R.C. § 4112.02, Lightning has been denied employment opportunities providing substantial compensation and benefits, thereby entitling Lightning to injunctive, equitable, and compensatory monetary relief.

169. As a result of Walmart's discrimination against Lightning in violation of O.R.C. § 4112.02, Lightning has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

170. In its discriminatory actions as alleged above, Walmart has acted with malice or reckless indifference to the rights of Lightning, thereby entitling Lightning to an award of punitive damages.

171. To remedy the violations of the rights of Lightning secured by O.R.C. § 4112.02, Lightning requests that the Court award her the relief prayed for below.

### COUNT IV: RETALIATORY WRONGFUL TERMINATION IN VIOLATION OF 42 U.S.C. § 2000e-3(a). (Asserted Against Walmart Only).

172. Lightning re-alleges and incorporates by reference the allegations set forth in paragraphs 1-147 above.

173. Lightning engaged in protected activity when she opposed racial harassment and discrimination while employed by Defendant.

174. In response to Lightning's opposition to racial harassment and discrimination, Walmart terminated her employment.

175. There was a causal connection between Lightning's complaints and the materially adverse actions taken against Lightning by Walmart and its agents.

176. The retaliation endured by Lightning would dissuade a reasonable employee from making complaints of discrimination and harassment.

177. Walmart retaliated against Lightning for engaging in protected activity in violation of Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a).

178. Walmart's retaliation against Lightning violated the rights secured to her by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e et seq., as amended by the Civil Rights Act of 1991.

179. By the retaliatory conduct described above, Walmart intentionally violated Lightning's rights under Title VII.

180. As a result of the violation of Lightning's Title VII rights, Lightning is entitled to equitable and injunctive relief, including "rightful place" and "make whole" remedies and equitable monetary relief, to remedy and compensate for the effects of Walmart's unlawful actions.

181. In their retaliatory actions as alleged above, Walmart has acted with malice or reckless indifference to Lightning's rights, thereby entitling Lightning to an award of punitive damages.

182. To remedy the violation of Lightning's rights secured by Title VII, Lightning request that the Court award him the relief prayed for below.

17

## COUNT V: RETALIATORY WRONGFUL TERMINATION IN VIOLATION OF O.R.C.§ 4112.02(I).

183. Lightning re-alleges and incorporates by reference the allegations set forth in paragraphs 1-147 above.

184. Lightning engaged in protected activity when she opposed racial harassment and discrimination while employed by Defendant.

185. As a result of Lightning's opposing racial harassment and discrimination, Defendants terminated her employment.

186. There was a causal connection between Lightning's complaints and the materially adverse actions taken against Lightning by Defendants.

187. The retaliation endured by Lightning would dissuade a reasonable employee from making complaints of discrimination and harassment.

188. Defendants retaliated against Lightning for engaging in protected activity in violation of R.C.§ 4112.02(I).

189. Defendants' retaliation against Lightning violated the rights secured to Lightning by R.C.§ 4112.02(I).

190. By the retaliatory conduct described above, Defendants intentionally violated Lightning's rights under R.C.§ 4112.02(I).

191. As a result of the violation of Lightning's R.C.§ 4112.02(I) rights, Lightning is entitled to equitable and injunctive relief, including "rightful place" and "make whole" remedies and equitable monetary relief, to remedy and compensate for the effects of Defendants' unlawful actions.

192. In their retaliatory actions as alleged above, Defendants have acted with malice or reckless indifference to Lightning's rights, thereby entitling Lightning to an award of punitive damages.

193. To remedy the violation of Lightning's rights secured by R.C.§ 4112.02(I), Lightning request that the Court award her the relief prayed for below.

## COUNT VI: INTERFERENCE WITH EXERCISE OF RIGHTS IN VIOLATION OF THE FAMILY MEDICAL LEAVE ACT.

194. Lightning re-alleges and incorporates by reference the allegations set forth in paragraphs 1-147 above.

195. Lighting requested leave for an FMLA qualifying event.

196. Defendants unlawfully interfered with Lightning's exercise of her rights under the FMLA in violation of Section 105 of the FMLA and section 825.220 of the FMLA regulations by failing to notify Lightning of her rights under the FMLA and/or by misleading Lightning to believe that she was only entitled to two weeks of leave; and by terminating Lightning employment for absences that should have and would been covered by the FMLA had Defendants not interfered with Lightning's rights.

197. Lightning was prejudiced by Defendants' failure to provide accurate and complete notice of her rights under the FMLA.

198. As a direct and proximate cause of Defendants' wrongful conduct, Lightning suffered and will continue to suffer damages.

199. As a direct and proximate cause of Defendants' wrongful conduct, Lightning is entitled to all damages provided for in 29 U.S.C. § 2617, including liquidated damages, costs and reasonable attorney's fees.

## COUNT VII: UNLAWFUL RETALITION IN VIOLATION OF THE FAMILY MEDICAL LEAVE ACT.

200. Lightning re-alleges and incorporates by reference the allegations set forth in paragraphs 1-147 above.

201. The FMLA provides that "[i]t shall be unlawful for any employer to discharge ... any individual for opposing any practice made unlawful by" the FMLA.

202. Lightning engaged in an activity protected by the FMLA when she requested leave for an FMLA qualifying event.

203. Lightning engaged in an activity protected by the FMLA when she took FMLA leave.

204. Defendants knew that Lightning had engaged in activity protect by the FMLA.

205. Defendants terminated Lightning because she had engaged in activity protect by the FMLA.

206. There was a causal connection between Lightning's protected activity and her termination, as Defendants' stated reason for terminating Lightning was "attendance" when Lightning was absent for FMLA qualifying reasons.

207. As a direct and proximate cause of Defendants' wrongful conduct, Lightning suffered and will continue to suffer damages.

208. As a direct and proximate cause of Defendants' wrongful conduct, Lightning is entitled to all damages provided for in 29 U.S.C. § 2617, including liquidated damages, costs and reasonable attorney's fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Terraine Lightning requests judgment against Defendants, containing the following relief:

(a) A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States;

(b) An injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

(c) An order directing Defendant to place Lightning in the position she would have occupied but for Defendants' discriminatory treatment of her, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and other unlawful conduct are eliminated and do not continue to affect Lightning;

(d) An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Lightning for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

(e) An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Lightning for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

(f) An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Lightning for harm to her professional and personal reputation and loss of career fulfillment;

(g) Finding that Defendants' violation of the FMLA was willful and awarding Lightning liquidated damages;

(h) An award of damages for any and all other monetary and/or non-monetary losses suffered by Lightning in an amount to be determined at trial, plus prejudgment interest;

(i) An award of punitive damages;

(j) An award of costs that Lightning has incurred in this action, as well as Lightning's reasonable attorneys' fees to the fullest extent permitted by law; and

(k) Awarding such other and further relief that this Court deems necessary and proper.

Respectfully submitted,

*/s/Chris P. Wido*
Chris Wido (0090441)
**THE SPITZ LAW FIRM, LLC**
25200 Chagrin Boulevard, Suite 200
Beachwood, Ohio 44122
Phone: (216) 291-4744
Fax:    (216) 291-5744
Email:

*Attorney for Plaintiff Terraine Lightning*

## **JURY DEMAND**

Plaintiff Terraine Lightning demands a trial by jury by the maximum number of jurors permitted.

*/s/Chris P. Wido*
Chris P. Wido (0090441)
**THE SPITZ LAW FIRM, LLC**
